## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| **DIANA PANTELAS,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| **MENTOR ABI, LLC d/b/a** | ) | |
| **NEURORESTORATIVE MAINE,** | ) | |
| | ) | |
| Defendant | ) | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Diana Pantelas ("Plaintiff" or "Ms. Pantelas"), by and through the undersigned counsel, hereby complains against Defendant Mentor ABI, LLC d/b/a Neurorestorative Maine ("Defendant" or "Mentor"), as follows:

## JURISDICTION AND PARTIES

1.      This action arises under Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.*, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§ 4551 *et seq.*, the Maine Whistleblowers' Protection Act ("WPA"), 26 M.R.S. §§ 831 *et seq.*, as enforced through the MHRA, and Maine's Timely and Full Payment of Wages Law ("TFPWL"), 26 M.R.S. §§ 621-A and 626 *et seq.*

2.      Ms. Pantelas is a United States citizen residing in the Town of Old Orchard Beach, County of York, State of Maine.

3.      Defendant is a Delaware limited liability corporation.

1

4.     Mentor does business in the State of Maine, including but not limited to operation of supported living programs in the Towns of Kennebunk and Old Orchard Beach, located in the County of York.

5.     Plaintiff is an "employee" as that term is defined under Title VII, the MHRA, and the WPA.

6.     Defendant has several thousand employees.

7.     This Court has subject matter jurisdiction over Ms. Pantelas' claims pursuant to 28 U.S.C. §§ 1331, 1332 and 1367.

8.     Plaintiff filed a timely Charge of Discrimination against Defendant with the Maine Human Rights Commission ("MHRC"), alleging that Defendant subjected her to unlawful discrimination on the bases of race and gender, disability discrimination, retaliation, and whistleblower retaliation.

9.     On November 16, 2020, the MHRC issued a Notice of Right to Sue.

## FACTUAL ALLEGATIONS

10.     Mentor is a provider of rehabilitation services for people with traumatic brain injuries.

11.     Mentor is a partner of The MENTOR Network, a national network of local health and human services providers.

12.     Ms. Pantelas began working for Mentor in May of 2017 as a Life Skills Trainer ("LST") and Certified Residential Medication Aide ("CRMA").

13.     From May 2017 to November 2018, Ms. Pantelas worked at the Kennebunk house operated by Mentor. The company then transferred her to the Old Orchard Beach house, where she worked for the remainder of her employment with Mentor.

14.     Ms. Pantelas' ethnic background is Greek. She has dark, olive-toned skin and could easily be perceived as a person of color.

15.     One of the clients Ms. Pantelas cared for at the Kennebunk house was known for racist behavior. This client treated white, light-skinned men and women working for Mentor far better than he treated people of color working for Mentor.

16.     Upon information and belief, the client perceived Ms. Pantelas to be a person of color and treated her in a manner that was hateful, racist, and bigoted. The client threw water at Ms. Pantelas, attacked her with a butter knife, and told her to get out of the house. He also called her names like "bitch" and "whore."

17.     This client had a history of treating people he perceived to be non-white with hostility and disrespect; he did not treat the staff he perceived to be white in the same manner.

18.     Ms. Pantelas was afraid to work with this client because he would either mistreat her or refuse to let her care for him.

19.     Ms. Pantelas reported to a residential supervisor, Samantha Cassidy, that the client was treating her in a racist and abusive manner. Ms. Cassidy did nothing in response to this complaint.

20.     Mentor did not provide staff with training on how to deal with a client's racist or discriminatory behavior.

21.     Ms. Pantelas' coworker also complained to Ms. Cassidy and Mentor about the client's racism and abuse. The coworker refused to work with the client because of his racist, abusive behavior. Mentor terminated Ms. Pantelas' coworker under the false pretense of insubordination.

3

22.     Ms. Pantelas feared that she would be terminated if she complained any further about the client's racist behavior.

23.     In 2018, when Ms. Pantelas was still working at the Kennebunk house operated by Mentor, she arrived to work and found a client on the ground outside the house.

24.     Ms. Pantelas approached the client to help him up and asked why he was alone on the ground. He responded that: "they won't get me up." The client is mobile but uses a cane for support. He weighed approximately 300 pounds and was around 60 years old.

25.     Ms. Pantelas was confused because it was against Mentor policy to leave a client that had fallen on the ground. She believed that leaving the client on the ground without assistance amounted to abuse and violation of a client/consumer's rights.

26.     Ms. Pantelas requested help from other staff members to assist her in getting the client back on his feet, but they declined. The staff told Ms. Pantelas that the residential supervisor, Ms. Cassidy, had instructed them to leave the client on the ground because he was having a behavioral "episode."

27.     Ms. Cassidy arrived and told Ms. Pantelas she had instructed the staff to leave the client on the ground to correct his behavioral issues. Ms. Cassidy specifically instructed Ms. Pantelas not to touch the client, stating: "he's having a behavior, we're going to teach him."

28.     Ms. Pantelas objected to this instruction and assisted the client to his feet alone.

29.     At this point, the client had been on the ground outdoors for 45 minutes in the hot sun.

30.     The client had a heart condition.

31.     Ms. Pantelas wrote and submitted an incident report because she believed the foregoing events amounted to client abuse.

32.    Twenty-four hours later, the client was hospitalized. Roughly two weeks after this incident, the client died.

33.    Ms. Pantelas believes the client's death was caused by the abuse and neglect described above.

34.    After the above events, Mentor removed Ms. Pantelas from the schedule at the Kennebunk house and refused to provide her with any scheduled hours.

35.    A few weeks later, Mentor transferred Ms. Pantelas to its Old Orchard Beach house against her wishes and for no legitimate reason other than retaliation.

36.    Ms. Pantelas reported to a residential supervisor named Lillian Chick while working at the Old Orchard Beach house.

37.    On or around April 19, 2019, Ms. Pantelas observed a Mentor residential supervisor kissing a client. She discussed the incident with a coworker present in the house at the time. The coworker then left to pick up another client, and the supervisor and client began yelling at Ms. Pantelas, begging her not to report the inappropriate kissing she had witnessed.

38.    Romantic interactions like the one Ms. Pantelas witnessed between a supervisor and a client are absolutely prohibited and considered a violation of client/consumer's rights.

39.    Ms. Pantelas was shocked by what she had witnessed. She felt harassed and intimidated by the supervisor who yelled at her to keep quiet. As soon as she was outside the client and supervisor's presence, Ms. Pantelas reported the kissing incident.

40.    Only twenty to thirty minutes passed between the kissing incident and Ms. Pantelas reporting it.

41.    Mentor Director Laurie Winslow and Manager Becca McIntire took adverse action against Ms. Pantelas, falsely claiming that she had waited too long to report the kissing

incident. Mentor also unreasonably criticized Ms. Pantelas for speaking to her coworker about the incident.

42.     Ms. Pantelas has a disability in that she is hearing impaired and completely deaf in one ear. As a result, Ms. Pantelas speaks loudly. She also finds that it takes longer to perform certain work tasks such as dispensing medications.

43.     In August of 2019, Mentor removed the task of passing out medications from Ms. Pantelas' list of responsibilities, claiming she took too long completing the task.

44.     Ms. Pantelas explained to her residential supervisor, Ms. Chick, that she needed to take more time passing out medications because of her hearing disability; by not rushing the process, Ms. Pantelas ensured that she did not make a medication error. Ms. Chick responded to Ms. Pantelas that she needed to move faster.

45.     Mentor's Old Orchard Beach house was frequently short staffed. Ms. Pantelas made numerous complaints about the staffing shortages to Ms. Chick.

46.     Some of the clients at the Old Orchard Beach house were staffed with a required ratio of two to one (2:1). However, Ms. Pantelas and her coworkers would often find themselves working with staffing numbers that did not comply with the required 2:1 ratio.

47.     Ms. Pantelas reasonably believed that working out of the required ratio jeopardized the safety of clients as well as staff.

48.     Ms. Pantelas also believed that Mentor was fraudulently collecting money from the State, which would pay the company for 2:1 staffing even when the ratio of two staff to one client did not exist.

49.     As a result of the short staffing, Ms. Pantelas suffered a workplace injury to her back in late August or early September of 2019.

50.     As a result of her workplace injury, Ms. Pantelas had lifting restrictions and was prohibited from working with clients alone. However, Ms. Chick consistently scheduled Ms. Pantelas to work alone, in violation of her work restrictions.

51.     Because of her workplace injury, Ms. Pantelas was out of work for the week of September 2, 2019, but she was not compensated.

52.     When Ms. Pantelas returned to work in September of 2019, Ms. Chick called her into the office. She asked why Ms. Pantelas was injured so often.

53.     Ms. Pantelas replied that she was frequently hurt because Mentor did not adequately staff the residences. Ms. Pantelas also stated that additional staff was needed because she was not able to work alone with a client, especially one with mobility issues.

54.     One client, RM, requires 2:1 staffing. Ms. Pantelas was scheduled to work with him alone despite her conversation with Ms. Chick reiterating her need for a workplace accommodation.

55.     Ms. Pantelas again reported to Ms. Chick that she was short staffed on the overnight shift. Ms. Pantelas reported that she was working alone and, due to her work restrictions, she would not be able transfer the clients should they need to get out of bed or use the bathroom.

56.     Instead of scheduling additional staff, Ms. Chick responded by telling Ms. Pantelas to force the client to sleep in his wheelchair to make any necessary transfer feasible. Ms. Chick's instruction was another blatant instance of client abuse.

57.     After she made the foregoing protected whistleblower reports in August and September of 2019, Mentor decreased Ms. Pantelas' hours from forty down to thirty each week.

There was no legitimate business reason for the reduction in hours given Mentor's continuous staffing difficulties.

58.     The only reasonable explanation for Mentor reducing Ms. Pantelas' hours is retaliation.

59.     Mentor struggles to retain employees and there is tremendous turnover within the company.

60.     Some of Mentor's supported living clients have aggressive behaviors and need constant one-on-one supervision.

61.      Mentor's understaffing was illegal and created unsafe conditions for clients as well as staff.  Supported living homes operated by Mentor are Level VI Residential Care Facilities, which are required to follow State of Maine, Department of Health and Human Services Regulations Governing the Licensing and Functioning of Assisted Housing Programs. Part 10-144, Chapter 113, Effective Date (Last Amended): August 20, 2008. Staffing levels are set forth at 13.1 and 13.2, as follows: 13.1 General requirements. Minimum staffing shall be adequate to implement service plans, as well as to provide a safe setting. The Department reserves the right to require additional personnel or to modify the requirements of this section due to the level of supervision and care required by the residents, the size of the facility, and distinct parts or distribution of residents throughout the physical plant. It is further required that all regular staff have in-service training at least annually, in areas related to the specific needs of the residents served.

62.     At one point, Mentor was so understaffed that the company offered a $100 bonus to employees who were willing to pick up additional shifts. Ms. Pantelas did this on a number of

occasions but never received her bonus. She followed up with Ms. Chick about the bonus pay, to no avail.

63.     Despite her work restrictions, Mentor scheduled Ms. Pantelas on one occasion to work alone with five clients.

64.     Ms. Pantelas is still treating with medical providers for her back condition, for which she recently had surgery.

65.     Mentor failed to accommodate Ms. Pantelas' ongoing back pain, which has had a duration of more than six months and significantly impairs her ability to work, lift, and do other activities of daily living.

66.     On September 9, 2019, Ms. Pantelas met with Ms. Chick and filled out a performance form regarding her back injuries. She stated that she did not need additional training to prevent injury but that she needed additional staff to be scheduled to prevent injury.

67.     On September 9, 2019, Ms. Pantelas learned that a new staff member was having trouble with a client from another one of Mentor's houses. A coworker asked Ms. Pantelas to go assist the new staff member and help deescalate the situation.

68.     When Ms. Pantelas arrived at the house and offered assistance, the coworker began to yell and curse at her.

69.     Out of frustration, Ms. Pantelas told the coworker she was acting like a bitch. Ms. Pantelas then returned to the house where she was assigned.

70.     Ms. Pantelas reported the above incident to management.

71.     Two days later, Mentor terminated Ms. Pantelas' employment.

72.     Ms. Pantelas' coworker, who had initiated the unprofessional interaction that resulted in Ms. Pantelas using the word "bitch," was not terminated. This coworker is not

someone that clients or staff perceive as a person of color. Upon information and belief, this coworker was not disabled and had not engaged in any protected whistleblower conduct.

73.    Mentor claimed that Ms. Pantelas was being terminated for performance issues and boundary issues.

74.    However, the allegations used as a reason for her termination were false and unsupported by any credible evidence.

75.    Mentor knowingly and willfully violated Ms. Pantelas's state and federally protected rights.

## COUNT I – RACE-BASED DISCRIMINATION IN VIOLATION OF TITLE VII
### (42 U.S.C. §§ 2000e, et seq.)

76.    Plaintiff repeats the allegations contained in Paragraphs 1 through 75 as if fully stated herein.

77.    Defendant discriminated against Plaintiff in the terms, conditions and privileges of her employment and terminated her because of her perceived race and skin color.

78.    Defendant's policies had the effect of discriminating against Plaintiff because of her perceived race and skin color.

79.    Defendant acquiesced in the racist, bigoted behavior of its client toward Ms. Pantelas and other staff members, solely on the basis of perceived race or skin color.

80.    Defendant's acquiescence to its client's racist behavior toward Ms. Pantelas and others created a hostile and abusive working environment in violation of Title VII.

81.    As a result of Defendant's discriminatory actions, Ms. Pantelas has suffered and is entitled to damages, including but not limited to: lost wages and benefits, front pay, compensatory damages including emotional pain and suffering and lost enjoyment of life, attorney's fees, costs and expenses.

10

WHEREFORE, Plaintiff Diana Pantelas requests that the Court award her damages in the form of lost back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

### COUNT II – RETALIATION IN VIOLATION OF TITLE VII
**(42 U.S.C. §§ 2000e, et seq.)**

82.   Plaintiff repeats the allegations contained in Paragraphs 1 through 81 as if fully stated herein.

83.   Defendant retaliated against Plaintiff for opposing a practice made unlawful by Title VII.

84.   Plaintiff specifically made a report of racist behavior that violated Title VII to Mentor, but Defendant took no corrective actions in response.

85.   Instead, Defendant took adverse action against Plaintiff because of her reports of discrimination based on her perceived race and/or skin color.

86.   As a result of Defendant's retaliation, Ms. Pantelas has suffered and is entitled to damages, including but not limited to: lost wages and benefits, front pay, compensatory damages including emotional pain and suffering and lost enjoyment of life, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff Diana Pantelas requests that the Court award her damages in the form of lost back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

## COUNT III – DISABILITY DISCRIMINATION UNDER THE ADA
### (42 U.S.C. § 12101 et seq.)

87.     Plaintiff repeats the allegations contained in Paragraphs 1 through 86 of the Complaint as if fully set forth herein.

88.     At all times herein relevant, Ms. Pantelas was a qualified individual with a disability within the meaning of the ADA.

89.     Defendant engaged in unlawful disability discrimination against Ms. Pantelas in violation of the ADA.

90.     Defendant's stated reasons for disciplining Ms. Pantelas were really pretext for disability discrimination.

91.     Defendant regarded Ms. Pantelas as being disabled.

92.     Ms. Pantelas has a record of a disability.

93.     Defendant failed to engage in the appropriate interactive process with Ms. Pantelas, despite being aware of and taking adverse action against her as a result of her known disability.

94.     Defendant failed to provide Ms. Pantelas with all of the reasonable accommodations that were necessary for her disability in order to perform the essential functions of her job.

95.     As a result of Defendant's discriminatory actions, Ms. Pantelas has suffered and is entitled to damages, including but not limited to: lost wages and benefits, front pay, compensatory damages including emotional pain and suffering and lost enjoyment of life, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff Diana Pantelas requests that the Court award her damages in the form of lost back pay, front pay, compensatory damages, liquidated damages, punitive damages,

attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

**COUNT IV – RETALIATION UNDER THE ADA**
**(42 U.S.C. § 12101 *et seq*.)**

96.     Plaintiff repeats the allegations contained in Paragraphs 1 through 95 of the Complaint as if fully stated herein.

97.     Throughout her employment, Defendant retaliated against Ms. Pantelas for making multiple reports of ADA violations and requesting accommodations for her disability.

98.     As a result of Defendant's retaliatory actions, Ms. Pantelas has suffered and is entitled to damages, including but not limited to: lost wages and benefits, front pay, compensatory damages including emotional pain and suffering and lost enjoyment of life, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff Diana Pantelas requests that the Court award her damages in the form of lost back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

**COUNT V – VIOLATION OF THE MAINE WHISTLEBLOWER'S PROTECTION ACT**
**(26 M.R.S. §§ 831 *et seq*.)**

99.     Plaintiff repeats the allegations contained in Paragraphs 1 through 98 as if fully stated herein.

100.     Plaintiff engaged in protected activity within the meaning of the Maine Whistleblower Protection Act ("MWPA") by making a complaint of abusive/racist behavior, violations of law, unsafe working conditions, client abuse, and other protected activity, throughout her employment.

101.     Plaintiff engaged in the aforementioned protected activity in good faith.

13

102.    Defendant took multiple adverse actions against Plaintiff because of her protected whistleblower activity.

103.    The aforementioned instance(s) of protected conduct bear a causal relationship to the adverse employment action(s) alleged herein.

104.    As a result of Defendant's whistleblower retaliation, Plaintiff has suffered and is entitled to damages, including but not limited to: lost wages and benefits, front pay, compensatory damages including emotional pain and suffering and lost enjoyment of life, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff Diana Pantelas requests that the Court award her damages in the form of lost back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

## COUNT VI – VIOLATION OF THE MAINE HUMAN RIGHTS ACT
### (5   M.R.S. § 4571 *et seq.*)

105.    Plaintiff repeats the allegations contained in Paragraphs 1 through 104 as if fully stated herein.

106.    For all of the reasons set forth in Counts I and III above, unlawful discrimination against Plaintiff has taken place within the meaning of the Maine Human Rights Act.

107.    For all of the reasons set forth in Counts II and IV above, unlawful retaliation against Plaintiff has taken place within the meaning of the Maine Human Rights Act.

WHEREFORE, Plaintiff Diana Pantelas requests that the Court award her damages in the form of lost back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

## COUNT VII – VIOLATION OF MAINE'S TIMELY AND FULL PAYMENT OF WAGES LAW
### (26 M.R.S. §§ 621-A and 626 *et seq.*)

108.     Plaintiff repeats the allegations contained in Paragraphs 1 through 107 of the Complaint as if fully stated herein.

109.     Plaintiff's unpaid bonus money had the same status as wages earned upon cessation of her employment with Mentor.

110.     Plaintiff's unpaid bonus was earned, due, and owing to Ms. Pantelas after she agreed to work additional shifts for which the organization was short staffed and therefore the bonus had the same status as wages earned for purposes of Maine's Timely and Full Payment of Wages Law.

111.     Defendants' failure to pay Ms. Pantelas these wages owed upon cessation of employment, or within a reasonable time after demand, amounts to a violation of the TFPWL.

112.     Under the penalty provisions of the TFPWL, Ms. Pantelas is entitled to an amount equal to twice the amount of his unpaid wages, plus reasonable attorney's fees, interest, and costs of suit.

WHEREFORE, Plaintiff Diana Pantelas requests that the Court award her damages in the form of lost back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

## JURY TRIAL DEMAND

Plaintiff Diana Pantelas hereby demands a jury trial on all matters so triable under the laws and Constitution of the United States and the State of Maine.

Dated:  February 12, 2021               */s/ Laura H. White*

_____

Laura H. White, Bar No. 4025
*Attorney for Plaintiff*
WHITE & QUINLAN, LLC
62 Portland Rd., Suite 21
Kennebunk, ME 04043
(207) 502-7484
*lwhite@whiteandquinlan.com*


/s/ *Danielle Quinlan*

_____

Danielle Quinlan, Bar No. 5480
*Attorney for Plaintiff*
WHITE & QUINLAN, LLC
62 Portland Rd., Suite 21
Kennebunk, ME 04043
(207) 502-7484
*dquinlan@whiteandquinlan.com*